UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
FORT WAYNE DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | |
| v. ) | CAUSE NO.: 1:04-CR-79-TS |
| ) | |
| KELLEY FANNING, ) | |
| FRANKIE FANNING, *et al.* ) | |

**OPINION AND ORDER**

Kelley Fanning and his wife, Frankie Fanning, along with six other persons, have been charged in a two-count indictment. They are accused of conspiracy to possess, with the intent to distribute, more than 1,000 kilograms of marijuana and with knowing and intentional possession, with the intent to distribute, more than 1,000 kilograms of marijuana. The Fannings' troubles started when an anonymous caller reported to Grant County Sheriff's Department that something suspicious was happening outside their residence. The police responded to the call and in a short while discovered that more than 5,000 pounds of marijuana were being moved between two trucks parked on the Fannings' property. Believing that the officers unlawfully entered their property and illegally searched the two trucks without a warrant and without probable cause that some criminal activity was taking place on their property, the Fannings individually moved to exclude from trial any evidence seized by the police. The government objected to both motions, and the Court held an evidentiary hearing to determine the facts at issue. After the hearing, the parties submitted additional briefs in support of their positions.

**FACTS**

Kelley Fanning and Frankie Fanning live and have a recycling business at 2501 South 600 East, Marion, Indiana. Their home is on the east side of the 600 East County road. A sixty to seventy foot long driveway leads eastward from the county road to an unpaved area outside the residence. The driveway is not gated and, apart from providing access to the couple's residence, is also used by commercial trucks that come to pick up and drop off garbage dumpsters for the Fannings' recycling business. At the entrance of the driveway, a "No Trespassing" sign is posted. The unpaved area curves around the couple's home starting south of the residence and extending through the northeast side. Two trash dumpsters are placed within a stone's throw of the southeast side of the residence (in the unpaved area). A six-foot privacy fence, standing about sixty feet from the county road, closes off the residence and the property south of the residence from view of travelers on the county road. The fence has an opening for the driveway. Fannings built the fence to comply with the county ordinance, which required that the trash on the premises not be visible from the county road. There is no fence on the other three sides of the Fannings' property. *See* Gov't Exhibits 1, 5-9; Def's Exhibit A.

On October 20, 2004, around 10:00 a.m., the Grant County Sheriff's Department received an anonymous tip that something suspicious was taking place in relation to two semi-trailers parked back-to-back on the east side of the Fannings' residence. Deputy William Grubb was dispatched to follow up on the call. Deputy Grubb pulled into the Fannings' driveway and parked his fully marked police car beside the privacy fence. From the location where he was parked (and from the road), Deputy Grubb saw on the east side of the residence a semi-trailer and a yellow moving truck backed up rear to rear (from the road the moving truck looked like a semi-trailer). He also saw two men,

2

Kelley and a Hispanic man, standing near a dumpster. He could also see some people in the back of the semi-trailer.

Deputy Grubb called Kelley to come over to speak with him. Kelley informed Deputy Grubb that he was the property owner, but when questioned about the trucks, he answered that he did not know what they were doing there. He also said that he did not know who the people were whom Deputy Grubb observed.

Feeling that something was not right, Deputy Grubb called for back up. At this time, Kelley was left alone and he continued working outside the residence. Shortly, Deputy Dale Beck and Sergeant Scott Reed arrived to assist Deputy Grubb. Sergeant Reed spoke with Kelley, who again reiterated his ignorance about the people and the trucks on his property. Deputy Grubb and Sergeant Reed then spoke to the Hispanic man, who told them that he had been driving to Angola from Mission, Texas, on I-69, when his ninth and tenth gears broke down near a truck stop located several miles away from the residence. He said he then made a phone call from the truck stop and was told that he should meet some people at this residence to unload his cargo of concrete pillars. He also said that four people, whom he did not know, were now in the back of the semi-trailer unloading the pillars. Sergeant Reed told him that his story seemed a little weird and that he found it hard to believe that someone would continue driving to the location in the countryside after his truck broke down near an interstate truck stop. Sergeant Reed said, "Man, your story sucks," to which the Hispanic man, somewhat chuckling, responded, "Yeah, it does, doesn't it?"

After speaking to both men, Sergeant Reed remained puzzled and suspicious about the trucks and the unknown men. He called an additional officer, Deputy Sands, to come to the location. He then instructed the Hispanic man to pull the yellow moving truck away from the trailer so that he

3

could identify the people inside. The Hispanic man complied, and Sergeant Reed saw five men inside, whom the officers ordered out and cuffed for their safety. Finding five, instead of four men as told by the Hispanic man, Sergeant Reed and Deputy Sands checked the semi-trailer to make sure no one else was in it. They did not find anyone else but could smell raw marijuana. Still looking for others, the officers checked the back of the moving truck.

When the sweep was over, the officers secured the area and called in a K-9 officer. Upon arrival, the dog alerted to the presence of illegal drugs, and the officers obtained a search warrant for the trucks and the Fannings' residence.

During the entire time the officers were on the Fannings' property, no one told them to leave. The officers contained their presence to the unpaved area outside of the residence. Kelley was not detained but, after being interviewed, was allowed to go about his business. The officers had no contact with Frankie at that time.

## DISCUSSION

### A. Kelley's Contentions

Kelley argues that the officers violated his constitutional rights when they searched the two trucks although they did not have a search warrant and he did not consent to the search. He argues that he had an expectation of privacy in the two trucks because they were located on his property, and absent a warrant, the officers could not search the trucks, unless they had probable cause of criminal activity. Kelley stresses repeatedly that neither the anonymous caller's tip nor his own statements—that he did not know what the trucks or unidentified persons were doing on his property—were sufficient to create probable cause. Thus, since no probable cause existed, he wants

4

to exclude all evidence recovered by the officers, as "fruit of the poisonous tree."

## B. Frankie's Contentions

Frankie contends that her Fourth, Fifth, Sixth, and Fourteenth Amendment rights were violated because the officers entered the curtilage of her home without reasonable suspicion of a crime, without probable cause, without a search warrant, and without the property owners' consent.[1] Consequently, she, too, is requesting that all evidence gathered as a result of the officer's search of the two trucks be excluded from trial.

## C. Government's Position

The United States maintains that neither Kelley nor Frankie have standing to challenge the search of the two trucks because they did not belong to them and they did not have any privacy interest in them. The government also submits that the officers were lawfully on the Fannings' property and were not precluded from talking to the people present there. Finally, the government points out that the officers never detained Kelley and had no contact at all with Frankie.

## DISCUSSION

"The party seeking suppression bears the burden of establishing that he had a reasonable expectation of privacy in the area and items searched." *See United States v. Meyer*, 157 F.3d 1067, 1079 (7th Cir. 1998). But neither Kelley nor Frankie have shown that they had any reasonable expectation of privacy in the two trucks, so as to bring a valid challenge to their search. This case

---

[1] In her briefs, Frankie does not explain how her Fifth, Sixth, and Fourteenth Amendment rights were violated; she limits all discussion to the Fourth Amendment issues.

is nothing like *United States v. Cellitti*, 387 F.3d 618 (7th Cir. 2002), a case submitted by Kelley to show his protected interest in the trucks.

In *Cellitti*, the government conceded that the defendant had a legitimate expectation of privacy in his fiancée's car, and the issue facing the court was whether the police coerced the fiancée into consenting to the search. In the case before this Court, the government is not conceding the issue of privacy, and neither Defendant claims that the trucks belonged to them or someone intimately linked to them. In fact, Kelley gives no basis at all as to why the Court should believe that he had any expectation of privacy in the trucks. Accordingly, Kelley and Frankie lack standing to challenge the search. *See Meyer*, 157 F.3d at 1080 (a defendant who has failed to establish that he had a reasonable expectation of privacy in an item does not have standing to challenge the search).

Nevertheless, both Kelley and Frankie may seek to exclude evidence collected by the officers on the grounds that the officers had no right to be on their property, and thus had no lawful access to the trucks. *See United States v. Swart*, 679 F.2d 698, 701 (7th Cir. 1982) ("[T]he legality of the search is contingent on the police having a right to be where they were when they discovered the item."). So, the question is whether Kelley or Frankie, or both, had a legitimate expectation of privacy in the parts of the property where the police placed themselves during their investigation. The answer is that they did not.

The Fourth Amendment's protection from unreasonable searches and seizures "is not limited to the four walls of one's home, but extends to the curtilage of the home as well." *United States v. French*, 291 F.3d 945, 951 (7th Cir. 2002). The home's curtilage is "the area outside the home itself but so close to and intimately connected with the home and the activities that normally go on there that it can reasonably be considered part of the home." *Siebert v. Severino*, 256 F.3d 648, 654 (7th

Cir. 2001). "At common law, the curtilage is the area that encompasses the intimate activities associated with the sanctity of the home and the privacies of life." *French*, 291 F.3d at 951. "[W]hether an area is within a house's curtilage depends not only on proximity to the house but also on the *use of the area and efforts to shield* it from public view and access as well as the nature for which it is used. *Id*. (citing *United States v. Dunn*, 480 U.S. 294, 302–03 (1987)).

The area outside the Fannings' home, where the police carried out their investigation and where the two trucks were parked, was not so close to and intimately connected with their home and the activities that normally go on in one's home that it could reasonably be considered part of the home. Nor was it associated with the sanctity of the home and the privacies of life. Although the driveway had a "No Trespassing" sign posted, the area outside the residence was used for the Fannings' recycling business; dumpster trucks used the driveway and the unpaved area outside the residence.

In addition, other persons had unobstructed access to the unpaved area. When Deputy Grubb arrived, a Hispanic man, whom Kelley claimed not to know, was standing in that area. Also, during the conversations with the Hispanic man and Kelley, Deputy Grubb saw other persons, whom Kelley also claimed not to know, peaking through an opening in the back of the semi-trailer. Finally, Kelley claimed not to know anything about the trucks parked in the unpaved area. As such it was apparent that the public was allowed access to the unpaved area, and that the area did not contain the elements generally associated with the intimate activities of a home. *See French*, 291 F.3d at 953–54 (where it was apparent that several members of the public had access to the defendant's walkway and were using it while a probation officer was on the defendant's property, the walkway did not constitute curtilage). There was no evidence that, at least during the business hours, the public's access to the

7

Fannings' driveway and the unpaved area was limited. Therefore, neither Kelley nor Frankie had a reasonable expectation that members of the public or officers from the Sheriff's department could not enter. *See United States v. Evans*, 27 F.3d 1219, 1229 (7th Cir. 1994); *see also French*, 291 F.3d at 954 ("It is not objectionable for an officer to come upon that part of private property opened to public common use and the officer[s] may use the 'route which any visitor to a residence would use . . . for the purpose of making a general inquiry or for some other legitimate reason.").

The wood fence did not transform the unpaved area into the curtilage, as it did not completely shield the area from the public's view and did not prevent a stranger's access. The fence was erected only on the side of the highway and was built to satisfy the zoning ordinance, which required that the trash on the premises would not be visible from the county road. The fence did not cross the driveway and no gate blocked one's entrance to the property.

Finally, the officers remained in the unpaved area of the residence. While there, they did not merely snoop around that area but interviewed two persons—Kelley and the Hispanic man—as a follow up to the anonymous tip. When neither of them were able to adequately account for the two trucks on the property or explain who the men in the blocked off semi-trailer were, the officers legitimately sought to speak with the men inside the semi-trailer. The only feasible way to do that was to move the trucks apart. Furthermore, since there were five men in the trailer and not four as told by the Hispanic man, the officers acted reasonably in checking to see whether anyone else was inside the trailer or the yellow moving truck. Since neither Kelley nor Frankie have met their burden to show that they had a reasonable expectation of privacy in the area where the officers remained, their arguments about probable cause or reasonable suspicion are irrelevant, and both of their attempts to exclude from trial evidence seized by the officers fail.

Kelley may not challenge his conversation with the officers, as his encounter with them did not implicate the Fourth Amendment. The officers never detained Kelley; he was free to go about his business, and, indeed, did just that: while the officers remained on his property, he worked around the dumpsters, and crisscrossed the area unimpeded. The officers did not display any force nor limited his movement in any way. Kelley's encounter with the officers was consensual, and he voluntarily answered their questions. *See Florida v. Bostick*, 501 U.S. 429 (1991) ("Our cases make it clear that a seizure does not occur simply because a police officer approaches an individual and asks a few questions. So long as a reasonable person would feel free "to disregard the police and go about his business," the encounter is consensual and no reasonable suspicion is required."); *see also United States v. Scheets*, 188 F.3d 829, 836 (7th Cir. 1999) (when an officer is seeking a citizen's voluntary cooperation through non-coercive questioning, the Fourth Amendment is not implicated).[2]

## CONCLUSION

Since the Grant County's police officers did not violate Kelley Fanning's or Frankie Fanning's Fourth Amendment rights, the Court DENIES Kelley Fanning's Motion to Suppress [DE 100], and Frankie Fanning's Motion to Suppress [DE 102].

SO ORDERED on May 11, 2005.

    s/ Theresa L. Springmann
THERESA L. SPRINGMANN
UNITED STATES DISTRICT COURT

---

[2] Frankie did not encounter the officers at all and, as a result, she does not have a basis to exclude evidence on the grounds of lack of consent. Morever, despite her claim that her Fifth, Sixth, Fourteenth Amendment rights were also violated, she has not presented any evidence or argument in support of those claims.